UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

FREEDOM FROM RELIGION FOUNDATION, INC.,
DAN BARKER AND ANNIE LAURIE GAYLOR,
CO-PRESIDENTS OF FFRF,

Plaintiff,

v.

Case No.  17-CV-330

DONALD TRUMP, PRESIDENT
OF THE UNITED STATES; and
JOHN KOSKINEN, COMMISSIONER
OF THE INTERNAL REVENUE SERVICE,

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. President Trump signed on May 4, 2017, an Executive Order ("EO") ostensibly meant to "vigorously enforce Federal law's robust protections for religious freedom," but which actually privileges religion over nonreligion.

2. The EO, in particular, requires the Internal Revenue Service ("IRS"), under direction of the Commissioner of the IRS, John Koskinen, "to exercise maximum enforcement discretion to alleviate the burden of the Johnson Amendment, which prohibits religious leaders from speaking about politics and candidates from the pulpit," according to the President when announcing his Order.

3. Among many faults, the EO requires the IRS to selectively and preferentially discontinue enforcement of the electioneering restrictions of the tax code against churches and religious organizations, while applying a more vigorous enforcement standard to secular nonprofits.

4. The official White House Twitter account further describes the EO as having the intended effect of "stopping the IRS from revoking a church's or nonprofit's tax-exempt status if it chooses to support a political cause."

5. During the signing ceremony, which occurred on the National Day of Prayer, President Trump further emphasized that the EO is meant to literally undue the Johnson Amendment or signal that the IRS will not enforce the Johnson Amendment against churches and religious organizations:

> No American should be forced to choose between the dictates of the federal government and the tenets of their faith. As I campaigned across the country, faith leaders explained that they were prevented from speaking their minds because of a 1954 rule known as the Johnson Amendment, I spoke about it a lot. Under this rule, if a pastor, priest, or imam speaks about issues of public or political importance they are threatened with the loss of their tax-exempt status. A crippling financial punishment--very very unfair. But no longer. I promised to take action. . . . And to this end, this financial threat against the faith community is over. In just a few moments I will be signing an executive order to follow through on that pledge and to prevent the Johnson Amendment from interfering with your First Amendment rights--and you're the people I want to listen to. . . . You're now in a position where you can say what you want to say.

6. Thus, according to President Trump, the EO is meant to effect a significant change in the status quo:

> For too long the federal government has used the power of the state as a weapon against people of faith, bullying and even punishing Americans for following their religious beliefs -- it's been happening. That is why I am signing, today, an executive order to defend the freedom of religion and speech in America, the freedoms that we've wanted, the freedoms that you've fought for so long and we are doing it in just a little while, right over here.

7. President Trump also made clear in his remarks that this EO is only meant to benefit religious groups, and specifically churches:

> This executive order directs the IRS not to unfairly target churches and religious organizations for political speech. No one should be censoring sermons or targeting pastors. In America we do not fear people speaking freely from the pulpit, we embrace it. . . . Under

my administration, free speech does not end at the steps of a cathedral or synagogue or any other house of worship, we are giving our churches their voices back—we are giving them back in the highest form. With this EO we also make clear that the federal government will never ever penalize any person for their protected religious beliefs.

8. The President's EO attempts to do something for which he has no constitutional authority: selectively veto a legitimate statute that Congress passed and the President signed into law more than 50 years ago.

9. The President proclaimed his intention to self-legislate at the National Prayer Breakfast, on February 2 of this year, boasting that "I will get rid of and totally destroy the Johnson Amendment and allow our representatives of faith to speak freely and without fear of retribution."

10. The Plaintiffs seek a declaration under 28 U.S.C. §2201 that Defendants, in issuing and obeying this EO, violate the Establishment Clause of the First Amendment to the Constitution of the United States.

11. The Defendant's actions also violate the Plaintiffs' Equal Protection and Free Speech rights.

12. Finally, the President also lacks any enumerated or implied power to overturn a legitimate law and his attempt to do so violates the Take Care Clause of the United States Constitution.

13. Plaintiffs request the Court to enjoin the Defendant Koskinen from implementing President Trump's EO compelling selective and preferential non-enforcement of the electioneering restrictions against churches and religious organizations.

14. The Plaintiffs also request the Court to order the Defendants to neutrally enforce the restrictions in Internal Revenue Code §501(c)(3) against churches and religious

organizations, including the electioneering restrictions, consistent with the same enforcement standards applied to secular non-profit organizations.

## JURISDICTION AND VENUE

15. This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 with respect to the relief sought against the Defendants.

16. The Court also has the authority to issue a declaratory judgment under 28 U.S.C. §2201. The Court further has the authority to award injunctive relief under 28 U.S.C. §1443 and Fed. R. Civ. P. 65.

17. The United States has waived sovereign immunity, pursuant to 5 U.S.C.§702, for actions that seek specific relief other than money damages, as in this case.

18. Venue is appropriate in the District Court for the Western District of Wisconsin pursuant to 28 U.S.C. §1391(e), where FFRF has its principal office.

## PARTIES

19. Plaintiff FFRF is a tax-exempt non-profit organization under §501(c)(3) of the Internal Revenue Code, and as such, FFRF must and does abide by the electioneering restrictions of §501(c)(3).

20. Plaintiff FFRF is a non-profit membership organization that advocates for the separation of church and state and educates on matters relating to nontheism; FFRF, in fact, successfully challenged the constitutionality of the National Day of Prayer, in a decision by the District Court for the Western District of Wisconsin, which was later vacated on grounds of standing, but not on the merits.

21. The Plaintiff has more than 28,000 members, residing in every state of the United States, including more than 1,400 in Wisconsin, as well as members in the District of Columbia.

22. FFRF represents and advocates on behalf of its members throughout the United States.

23. FFRF's membership includes individuals who are federal taxpayers who are opposed to government preferences and favoritism toward religion.

24. Plaintiff Annie Laurie Gaylor is a Lifetime Member of, and Co-President of FFRF, and she is a rational and recognized spokesperson for FFRF.

25. Plaintiff Dan Barker also is a Lifetime Member of, and Co-President of FFRF, and he too is a rational and recognized spokesperson for FFRF.

26. Plaintiff FFRF previously settled a lawsuit against the IRS for its failure to enforce the electioneering restrictions, in 2014, whereby the IRS duly assured appointment of authorized personnel to enforce those restrictions. FFRF then voluntarily dismissed that case, which was pending in the Eastern District before Judge Adelman. *See* Plaintiff's Memorandum in Support of Motion to Dismiss, *FFRF v. Koskinen*, No. 12-0818 (July 29, 2014).

27. The Defendant Donald J. Trump is the President of the United States with a principal address of 1600 Pennsylvania Ave., Washington, D.C., 20006; Defendant Trump is sued in his official capacity.

28. The Defendant Josh Koskinen is the Commissioner of the Internal Revenue Service, with a principal address of 1111 Constitution Avenue N.W., Washington, D.C. 20224; the Defendant Koskinen is sued in his official capacity.

## LEGAL BACKGROUND

29. The Establishment Clause of the First Amendment to the United States Constitution prohibits governmental preference for, endorsement of, and discrimination in favor of religion.

30. Section 501(c)(3) of the Tax Code prohibits all non-profit organizations, including churches and other religious organizations, from intervening in political campaigns as a condition of their tax-exempt status.

31. The electioneering restrictions of § 501(c)(3), known as the Johnson Amendment, were enacted by a Republican Congress and signed in law by President Eisenhower, also a Republican, in 1954.

32. Under the Johnson Amendment, all organizations that are recognized as exempt from federal income tax under §501(c)(3) of the Tax Code are subject to the prohibition against political campaign intervention.

33. All organizations, including churches and religious organizations, that are exempt from federal income tax under §501(c)(3) of the Tax Code are prohibited from participating or intervening, directly or indirectly, in political campaigns on behalf of or in opposition to any candidate for elective public office.

34. The restrictions of §501(c)(3) on electioneering activities do not preclude discussions of issues that are not linked to support for or opposition to candidates; the fact that candidates may align themselves on one side or another of an issue does not restrict the ability of religious organizations or any other (c)(3) nonprofits from to engage in discussions of that issue.

35. A discussion of issues violates the electioneering restrictions of §501(c)(3) only if the discussion contains overt or tacit support for or opposition to a particular candidate.

36. Factors relevant to determining whether an advocacy communication constitutes impermissible campaign intervention include: (a) whether the communication identifies one or more candidates for a public office; (b) whether the communication expresses approval or disapproval of one or more candidates' positions and/or actions; (c)

6

whether the communication is delivered close in time to an election; (d) whether the statement makes reference to voting or an election; and (e) whether the issue addressed in the communication has been raised as an issue distinguishing candidates for a given office. I.R.S. Fact Sheet FS-2006-17, February 2006, "Election Year Activities and the Prohibition on Political Campaign Intervention for Section 501(c)(3) Organizations."

37. The electioneering prohibition of §501(c)(3) applies, as adopted by Congress, even-handedly to tax-exempt organizations, including churches and religious organizations, and to the actions of individuals, including clergy or other religious leaders, acting as representatives of tax-exempt organizations; the prohibition of §501(c)(3) does not apply to the political activities of clergy or other religious leaders undertaken in their individual capacities.

38. The Internal Revenue Service follows special procedures before commencing inquiries about potential violations of §501(c)(3) by a church or religious organization.

39. The IRS may initiate a tax inquiry of a church or religious organization if a high- ranking IRS official documents in writing the acts and circumstances, including potential violations of the electioneering prohibition, that lead the official to reasonably believe that the Church may have violated the requirements for tax exemption under §501(c)(3).

40. Until FFRF commenced suit against the IRS in 2014, no authorized official had been appointed.

41. According to an evangelical polling group, Lifeway Research, whose slogan is "Biblical Solutions for Life," nearly 80% of Americans say it's inappropriate for pastors to endorse a candidate in church and 75% do not believe it is appropriate for churches to publicly endorse candidates. Lifeway Research, "American Views on Candidate Endorsements and Tax Exemption," (2015) *available at* http://bit.ly/2p8Anyt.

**FACTS: DONALD TRUMP ON THE JOHNSON AMENDMENT**

42. President Trump has made clear in multiple statements his intention to overturn the Johnson Amendment as it applies to churches.

43. In a closed-door meeting with "hundreds of Christian conservatives" on June 21, 2016, President Trump spoke about the Johnson Amendment in audio that was leaked to the Washington Post. The audience was almost exclusively Christian: "The audience included leaders and founders of many segments of the Christian Right, the evangelical movement that began in the 1970s under people including the late Jerry Falwell. Among those present and involved in the program Tuesday were Focus on the Family founder James Dobson (who is no longer with that group), former Christian Coalition head Ralph Reed and evangelist Franklin Graham (son of evangelical icon Billy Graham)." Michelle Boorstein and Julie Zauzmer, "Thrilling Christian conservative audience, Trump vows to lift ban on politicking, appoint antiabortion judges," *The Washington Post* (June 22, 2016) *available at* http://wapo.st/1sNMD8W. *See the full transcript at*, Jon Ward, "Transcript: Donald Trump's closed-door meeting with evangelical leaders," *Yahoo News* (June 22, 2016) *at* https://yhoo.it/2pFclfl.

44. President Trump told this group of Christians, "The government has gotten so involved in your religion. Especially *your* religion, that it makes it very difficult. . . . You really don't have religious freedom, if you really think about it, because when President Johnson had his tenure, he passed something that makes people very, very nervous to even talk to preserve their tax-exempt status. And it's taken a lot of power away from Christianity," adding as an afterthought, "and other religions." [Note: The italicized emphasis appears in the original transcript. Contrary to the above, President Eisenhower signed the Johnson Amendment into law; it was proposed and named after Lyndon Johnson, then a United States Senator.]

45. President Trump also told this group that he attributes the decline of Christianity in America to the Johnson Amendment, which he will get rid of. He told a story he reiterated many times: "We were at a meeting of 50 ministers, pastors, Christians, two rabbis. I said, 'Why is it that the whole thing with Christianity, it's not going in the right direction? It's getting weaker, weaker, weaker from a societal standpoint?' And over the course of various meetings, I realized that there are petrified ministers and churches. . . . [W]hen it comes to talking about it openly or who they support or why they support somebody because he's a person — a man or a woman — who is into their values, they're petrified to do it. And I couldn't get the answer. And then one day, at one of our meetings, somebody said, 'They're petrified of losing their tax-exempt status.' And I said, 'What is that all about?' And they went into it. It was what happened during the Johnson [Eisenhower] administration. . . . And we are going to get rid of that, because you should have the right to speak."

46. In that same meeting, President Trump said that overturning the Johnson Amendment "will be my greatest contribution to Christianity," again adding as an afterthought, "and other religions."

47. President Trump clarified that he was going to get rid of the Johnson Amendment to help stem the decline of American Christianity: "And we have to get rid of that, and if we don't, I really think you're going to have a continuing spiral. And I don't want to see that, because I've been a Christian and I love Christianity. And the evangelicals have been so incredibly supportive."

48. Promising to overturn the Johnson Amendment as a reward or benefit to American Christians while adding other religions as an afterthought is a message President Trump repeats regularly.

9

49. In his acceptance speech at the Republican Convention, President Trump again singled out one particular sect of Christianity, evangelicals, and characterized the Johnson Amendment as an attack on that particular Christian sect: "At this moment, I would like to thank the evangelical and religious community in general who have been so good to me and so supportive. You have much to contribute to our politics, yet our laws prevent you from speaking your minds from your own pulpits. An amendment, pushed by Lyndon Johnson, many years ago, threatens religious institutions with a loss of their tax-exempt status if they openly advocate their political views. I am going to work very hard to repeal that language and protect free speech for all Americans."

50. When President Trump introduced Mike Pence as his running mate on July 16, 2016, he also singled out evangelicals as the beneficiary of his attack on the Johnson Amendment: "And what we're doing—and what we're doing that I'm so proud of, so proud—and nobody else would even think about doing it— I fought very hard for it. We'll call it the Johnson amendment, where he took away from the evangelicals—and I want to thank the evangelicals, because without the evangelicals, I could not have won this nomination. The evangelicals have been unbelievable. I dominated with the evangelicals. . . . And I said—and I said for the evangelicals, that we're going to do something that nobody's even tried to do. You have the Johnson amendment passed by [drafted by] Lyndon Johnson and his group. . . . the Johnson amendment, where you are just absolutely shunned if you're evangelical, if you want to talk religion, you lose your tax-exempt status. We put into the platform, we're going to get rid of that horrible Johnson amendment. And we're going to let evangelicals—we're going to let Christians and Jews and people of religion—talk without being afraid to talk."

51. At the Family Research Council's 11th Annual Values Voter Summit on September 9, 2016, President Trump again clarified that his desire to end the Johnson

Amendment is tied to helping Christian churches: "The first thing we have to do is give our churches their voice back. It's been taken away. The Johnson amendment has blocked our pastors and ministers and others from speaking their minds from their own pulpits. If they want to talk about Christianity, if they want to preach, if they want to talk about politics, they're unable to do so. If they want to do it, they take a tremendous risk that they lose their tax-exempt status. . . . And I will repeal the Johnson amendment if I am elected your president, I promise. So important."

52. President Trump told the Summit that repealing the Johnson Amendment will help boost Christianity and other religions "like a rocket ship": "If I become president, we are going to knock out the Johnson amendment. We are going to do that. . . . And I actually believe that's one of the reasons why you haven't seen Christianity and other religions within the United States going like a rocket ship—like our polls have been going in the last four weeks, a rocket ship, right? I really believe that, because you're great people. The people that you rely on on Sunday and all during the week, they've been stopped from talking and speaking by a law. And we're going to get rid of that law and it's going to get rid of – we're going to get rid of it so fast."

53. President Trump again linked his vendetta against the Johnson Amendment to his support of Christianity in his October 3, 2016 remarks to a veterans group in Herndon, Virginia, "So one of the things I'm gonna do and I have tremendous support with the evangelicals and with the Christians and with everybody, is we're going to get rid of the Johnson Amendment that is very, very unfair, OK."

54. President Trump further proclaimed his intent to repeal the Johnson Amendment in order to benefit Christian leaders in a speech to African-American voters at the New Spirit Revival Center in Cleveland on September 21, 2016: "I pledge to you we're going to end the Johnson Amendment, which takes away the voice of your pastors, your

11

minister, your great leaders. It takes away their voice. We're going to end quickly—quickly—the Johnson Amendment."

55. President Trump also was very explicit about helping Christianity gain power by overturning the Johnson Amendment when addressing a group of pastors in Orlando Florida on August 11, 2016, telling the pastors: "You should be far more powerful. And if you look what's happened to religion, if you look at what's happening to Christianity, and you look at the number of people going to churches—and evangelicals know this also—it's not on this kind of a climb [gesturing to indicate increasing], it's on this kind of a climb [gesturing to indicate decreasing]. Slow and steady in the wrong direction and a lot of it has to do with the fact that you've been silenced. You've been silenced, like a child has been silenced." He continued, asking these pastors to tell everyone of his goal to repeal the Johnson Amendment, reiterating the huge benefit for evangelicals in particular: "I hope you can spread the word, this will be so great for religion, but it will be so great for the evangelicals, for the pastors, for the ministers, for the priests, for America, for America. You know, they took away your voice. . . . We'll be able to terminate the Johnson amendment. And you'll have great power to do good things. And religion will start going instead of this way [gesturing to indicate decreasing]–I mean, Christianity, when you think of what's happening, you look at the numbers. I talk about Sunday school and people don't even know what I'm talking about anymore. It's true. They don't know what I'm talking about. When you look—instead of going this way [gesturing to indicate decreasing], you're going to be going this way. [gesturing to indicate increasing] You may be going this way [gesturing to indicate steeply increasing]. But you're going to be going—we're going to bring it back because it's a good thing. It's a good thing."

56. President Trump promised to these pastors that evangelicals would be rewarded after the election, again adding other religions as an afterthought: "If we get the

evangelicals, we get the different people that are represented by you. . . .You're never going to have a chance again, 501(c)(3), termination for yourselves. Open speech, you can talk freely about who you like, think of that. You can have your people having—I mean dialogue within the churches and temples and whatever it may be, you can have actually dialogue, talk about who you want. It's never going to happen again folks. . . . we will win. And you will see things happen with—for the evangelicals. You will see things happen that you wouldn't believe. And—and, you know, really, most importantly, for religion, you're going to see things happen, for religion. All religions."

57.     President Trump has consistently mischaracterized the very nature of the electioneering restriction established by the Johnson Amendment in an effort to garner support with evangelical voters.

58.     The Johnson Amendment, in fact, does not prevent religious leaders, churches, or religious nonprofits from speaking on political issues, but merely prevents them from campaigning in elections on behalf of politicians, which the law also requires secular non-profit organizations to refrain from doing.

59.     At the National Prayer Breakfast, on February 2, 2017, Trump vowed to "get rid of and totally destroy the Johnson Amendment," as applied to churches and religious organizations.

**FACTS: THE EXECUTIVE ORDER**

60.     On the National Day of Prayer, May 4, 2017, President Trump signed an EO ordering the Secretary of the Department of the Treasury to selectively and preferentially impose a policy and practice of non-enforcement by the IRS of the § 501(c)(3) electioneering restrictions of the Internal Revenue Code against churches and religious organizations.

61.     The EO seeks to fulfill President Trump's promise made at the National Prayer Breakfast to "totally destroy the Johnson Amendment."

13

62. The President's EO is intended to literally and by stage whisper exempt churches and religious organizations from electioneering restrictions, but continues to impose them on secular and nonreligious 501(c)(3)s.

63. Section Two of the EO, "Respecting Religious and Political Speech," requires that all executive department and agencies "to the greatest extent practicable" respect and protect the freedom of persons and organizations to engage in religious and political speech.

64. Section Two further explains that "in particular, the Secretary of the Treasury shall ensure, to the extent permitted by law, that the Department of the Treasury does not take any adverse action against any individual, house of worship, or other religious organization on the basis that such individual or organization speaks or has spoken about moral or political issues from a religious perspective, where speech of similar character has, consistent with law, not ordinarily been treated as participation or intervention in a political campaign on behalf of (or in opposition to) a candidate for public office by the Department of the Treasury."

65. The EO, with the President's annotated interpretation and construction, makes clear that a relaxed and differential standard of enforcement of § 501(c)(3)' electioneering restrictions shall be applied to churches and religious officials.

66. The IRS is an administrative agency within the Department of the Treasury, and the Defendant Koskinen, as Commissioner of the IRS, shall be responsible for implementing a selective and preferential standard of non-enforcement of electioneering restrictions as to churches and church officials.

67. The EO not only directs a relax standard of enforcement in regard to churches and religious organizations, but also conveys the intended impression that the Government is actively sending a message to Christians, and particularly evangelicals, that the IRS will no longer enforce the Johnson Amendment against them, thereby encouraging electioneering by

churches and church officials, to the detriment of secular non-profit groups that are still held to a more rigorous standard of enforcement.

68. The Plaintiff FFRF, for its part, would be seriously harmed by enforcement of the electioneering restrictions if it violated § 501(c)(3), including by loss of tax-exempt status, which harm to FFRF would be devastating and irreparable.

69. The Defendant Koskinen, as the Commissioner of the IRS, is obligated to comply with President Trump's EO.

70. The Plaintiff FFRF, including by its co-Presidents Annie Laurie Gaylor and Dan Barker, would engage in speech prohibited by the electioneering restrictions of § 501(c)(3) if a neutral policy of non-enforcement applied to secular non-profits as well as to churches and other religious organizations.

71. The Plaintiffs, however, face a reasonable and credible threat of selective enforcement of the electioneering restrictions of § 501(c)(3) if they violate the law, based on IRS pronouncements of required compliance and enforcement policy, as well as President Trump's recognition of the restrictions as otherwise being real and effective.

72. The Internal Revenue Service, under the direction of Defendant Koskinen and under President Trump's new EO, is required to follow a selective and preferential policy of non-enforcement of the electioneering restrictions of §501(c)(3) against churches and other religious organizations.

73. As a result of President Trump's EO, churches and religious organizations will be able to blatantly and deliberately flaunt the electioneering restrictions of §501(c)(3), including during the upcoming 2018 elections, unlike secular non-profits, including FFRF.

74. The non-enforcement of the electioneering restrictions of §501(c)(3) against churches and other religious organizations constitutes preferential treatment of churches and

15

religious organizations that is not provided to other tax-exempt organizations, including FFRF, which are required to comply with the electioneering restrictions of §501(c)(3).

75. Plaintiffs face a real and credible threat of enforcement of the Johnson Amendment strictures as a secular nonprofit that is not covered under the EO, and as a result their speech is reasonably chilled.

76. The selective non-enforcement of §501(c)(3) as to churches and religious organizations provides preferential treatment that is not neutrally available to other tax-exempt organizations, including the Plaintiff FFRF in this case.

77. If FFRF were to endorse a political candidate it would risk losing its tax-exempt status under §501(c)(3), which would cripple fundraising and expose FFRF to potential tax liabilities.

78. The intended non-enforcement of §501(c)(3) as to churches and other religious organizations by the IRS, as a result of this EO, will directly benefit churches and religious organizations, while discriminating against other non-profit organizations, including the Plaintiff FFRF, solely on the basis of religious criteria.

79. President Trump's EO effectively amends §501(c)(3) and provides preferential treatment that is not neutral and generally applicable to all tax-exempt organizations.

80. The EO's policy of selective non-enforcement of the electioneering restrictions of §501(c)(3) as to churches and religious organizations violates the Establishment Clause of the First Amendment.

81. The intended policy of selective non-enforcement of electioneering restrictions against churches and other religious organizations was designed and intended for the purpose of advancing the interests of churches and religious organizations above the interests of similarly situated nonreligious organizations, by allowing the former to engage in electioneering activities while the latter cannot. It is also intended to favor Christianity as the

majority religion over other religions and evangelical Christianity as a voting bloc Trump depended on over other Christian sects.

82. The intended policy of selective non-enforcement of electioneering restrictions against churches and other religious organizations has the effect of providing a unique benefit to churches and religious organizations—the right to engage in electioneering activities while retaining 501(c)(3) tax exempt status.

83. President Trump's EO also creates the appearance of government endorsement of churches and religious organizations and a preference for these religious organizations above similarly situated nonreligious organizations.

84. The intended preferential treatment of churches and other religious organizations results in obligations imposed on secular non-profits, including the Plaintiffs, that are not imposed on churches, which distinction arises exclusively from the application of religious criteria.

85. The Plaintiffs will be disadvantaged *vis à vis* churches and religious organizations by the EO's intended result: the non-enforcement of the electioneering restrictions against churches and other religious organizations.

86. President Trump's EO also violates the Equal Protection requirement of the Fifth Amendment to the United States Constitution, which discrimination is not justified by any non-proscribed rationale.

87. Churches and religious organizations obtain a significant benefit as a result of being exempt from income taxation, while also being able to preferentially engage in electioneering, which is something secular tax-exempt organizations cannot do, including FFRF, as a result the speech of secular non-profits, including FFRF, is selectively chilled in violation of free speech rights under the First Amendment.

17

88. The preferential tax-exemption that churches and other religious organizations obtain, despite noncompliance with electioneering restrictions, amounts to more than $100,000,000,000 annually in tax-free contributions made to churches and religious organizations in the United States.

89. The policy and practice of non-enforcement of electioneering restrictions against churches and religious organizations mandated by this EO confer benefits solely on the basis of religious criteria, as to which the Plaintiff FFRF does not qualify solely because of the application of religious criteria.

90. Plaintiffs seek an order mandating that the enforcement policies of §501(c)(3) by the Defendant Koskinen not preferentially favor churches and religious organizations, thereby requiring a level playing field of neutral enforcement.

91. The intended policy of selective non-enforcement of electioneering restrictions against churches and other religious organizations has the effect of converting these organizations into unregulated political action committees, effectively excluding billions of dollars from taxation each year.

92. The tax benefits preferentially provided to churches and other religious organizations constitute an exclusive and discriminatory subsidy to religion in violation of the Establishment Clause of the First Amendment and the Equal Protection element of Fifth Amendment to the United States Constitution.

93. President Trump's EO also selectively undermines enforcement of a duly enacted U.S. law, thereby violating his duties under the Take Care Clause, as well as violating the separation of powers; the President's usurpation constitutes an *ultra vires* action for which he has no constitutionally delegated power to perform.

94. President Trump is required to faithfully enforce the law, refuting "the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

WHEREFORE, Plaintiffs demand judgment as follows:

a. Declaring that President Trump's Executive Order violates the Constitution of the United States by providing preferential treatment to churches;

b. Declaring the Executive Order to be in violation of the Take Care Clause; and to be in excess of Presidential authority under Article II of the Constitution; and to be an infringement on legislative authority in violation of the separation of powers; and to constitute an *ultra vires* act, and therefore the Executive Order is invalid;

c. Enjoining Defendant Koskinen from implementing President Trump's Executive Order;

d. Awarding the Plaintiffs their reasonable costs and disbursements of this action as allowed by law; and

e. Awarding such other relief as the Court deems just and equitable.

Dated this 4th day of May 2017.

>BOARDMAN & CLARK LLP
>By
>*/s/ Richard L. Bolton*
>Richard L. Bolton
>Wisconsin State Bar No. 1012552
>One South Pinckney Street, Ste. 410
>Madison, WI 53701-0927
>Telephone: (608) 257-9521
>Facsimile: (608) 283-1709
>Attorney for Plaintiffs
>rbolton@boardmanclark.com

## CERTIFICATE OF SERVICE

I certify that, on May 4, 2017, service of the foregoing was made upon all parties by filing it with the Clerk of Court using the CM/ECF system.

*/s/ Richard L. Bolton*

f:\docs\wd\26318\25\a2778842.docx