# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

FREEDOM FROM RELIGION
FOUNDATION, INC., DAN BARKER,
and ANNIE LAURIE GAYLOR, Co-
Presidents of FFRF,

    *Plaintiffs,*

  v.

Case No. 3:17-CV-00330

DONALD TRUMP, President of the
United States; and JOHN KOSKINEN,
Commissioner of the Internal Revenue
Service,

    *Defendants,*

CHARLES MOODIE, KOUA VANG,
PATRICK W. MALONE, and HOLY
CROSS ANGLICAN CHURCH,

    *Proposed Defendant-Intervenors.*

## BRIEF IN SUPPORT OF MOTION TO INTERVENE OF PROPOSED INTERVENORS CHARLES MOODIE, KOUA VANG, PATRICK MALONE, AND HOLY CROSS ANGLICAN CHURCH

For the second time in three years, Plaintiffs are back before this Court seeking to require the federal government to penalize one of the most sensitive and highly protected forms of speech safeguarded by the First Amendment: the teachings of religious leaders to their congregations, in their houses of worship, during religious services, and regarding matters of important religious belief that concern both internal church decisions and the public good. No one has more at stake in this lawsuit than those religious leaders and the congregations they serve. A diverse group of those leaders now seeks to once again intervene to protect their rights to speak freely with their congregations about their faith.

Proposed intervenors consist of Charles Moodie, the Pastor of Chicago City Life Center, an Assemblies of God church that serves the inner-city Englewood neighborhood in Chicago, Illinois; Koua Vang, the Pastor of Hmong Baptist Ministry, a small church in Madison, Wisconsin; Holy Cross Anglican Church, a small church in Waukesha, Wisconsin; and Holy Cross's rector, Father Patrick Malone. Each of the religious leader intervenors believes that he must preach on matters relevant to his church, including specific religious considerations that influence his respective congregation's members' choices about voting for or against political candidates. For its part, Holy Cross Anglican Church ("Holy Cross Anglican," or the "Church") believes that it has a religious duty to receive and act on Father Malone's guidance. While the religious leaders and Holy Cross Anglican understand that the Internal Revenue Service penalizes such religious teaching within the context of church services, proposed intervenors ("Intervenors") believe that they have a constitutional and statutory right to practice their faith by engaging in this necessary internal religious dialogue.

Plaintiff Freedom From Religion Foundation ("FFRF") brings this suit to force the IRS to penalize religious leaders and houses of worship, including Intervenors, for their internal religious guidance provided during religious services. Intervenors seek to protect their statutory and constitutional rights against the imposition of such penalties, and therefore oppose FFRF's lawsuit. As the real parties in interest, Pastor Moodie, Pastor Vang, Father Malone, and Holy Cross Anglican now move for leave to intervene as of right under Fed. R. Civ. P. 24(a). Several years ago, FFRF brought essentially the same suit before this Court seeking essentially the same relief. This Court granted intervention as of right to Father Malone and Holy Cross Anglican in

2

that case. *See Freedom From Religion Found. v. Koskinen*, 298 F.R.D. 385, 388 (W.D. Wis. 2014) ("*Koskinen I*"). The Court should grant intervention again in this follow-on lawsuit to *Koskinen I*.

Alternatively, Intervenors seek permissive intervention under Rule 24(b).

Both FFRF and Defendants stated that they have not formulated a position on the motion and will communicate their respective positions after reviewing the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Proposed Intervenors*

Pastor Charles Moodie is the head pastor at Chicago City Life Center ("Life Center"), a small church in the Englewood neighborhood of Chicago. Moodie Decl. ¶¶ 2, 4. In that role, he is responsible for preaching and teaching delivered at Life Center. *Id.* Life Center is affiliated with the Assemblies of God, a Pentecostal Protestant denomination. *Id.* ¶ 7. Pastor Moodie co-pastors the church with his wife, Kehinde, and they were drawn to Englewood to serve because of the neighborhood's problems with drugs, alcohol abuse, gangs, prostitution, and poverty. *Id.* ¶¶ 2, 4. On a given Sunday, most of the attendees of Life Center's worship service live in publicly subsidized housing. *Id.* ¶ 6. Life Center's worship services draw about 80 people on Sundays, and Tuesday outreach services draw about 120 people seeking food and clothing. *Id.* Life Center obtains its 501(c)(3) status as a church subordinate unit covered by the group exemption of the Assemblies of God, which is recognized by the IRS as a tax-exempt nonprofit corporation. *Id.* ¶ 9. Life Center was officially listed as part of the General Council of the Assemblies of God on August 31, 1992. *Id.* Life Center itself is an Illinois not-for-profit-corporation. *Id.* ¶ 8.

3

Pastor Koua Vang is the pastor of Hmong Baptist Ministry in Madison, Wisconsin ("Hmong Baptist"), and is the leader and primary preacher for the small church. Vang Decl. ¶ 2. Pastor Vang has served as a pastor for 16 years. *Id.* As a bi-vocational pastor, he supports his ministry through his work as an attorney and real estate investor. *Id.* Hmong Baptist is associated with the Southern Baptist Convention and the Hmong Baptist National Association. *Id.* ¶ 3. There are about 30 members of the church who regularly attend Sunday worship services. *Id.*

The Hmong people are an ethnic minority originally from Asia who have suffered persecution in many contexts. *Id.* ¶ 8. After the assistance they provided the United States during the Vietnam War in Laos and Vietnam left them exposed to severe persecution, many Hmong came to the United States to pursue freedom, including religious freedom. *Id.* ¶ 8, 10. As a part of his Christian faith, Pastor Vang believes it is important to serve both his congregation and his broader community. For example, when a group of protestors from Occupy Madison was evicted mid-winter from government land, Pastor Vang offered them a place to camp on his land to avoid leaving them without shelter. *Id.* ¶ 14. For his hospitality, he was fined $400 because his land was not zoned for camping. *Id.*

Father Malone is the rector of Holy Cross Anglican Church in Waukesha, Wisconsin, and is responsible for the Church's preaching and teaching. Malone Decl. ¶¶ 2-3. He is also a member of the Anglican Order of Saint Benedict and has served as Abbot of the Anglican Communion Benedictines, a community devoted to prayer. *Id.* ¶ 4. He has over 25 years of pastoral and ministry experience. *Id.*

Holy Cross Anglican is a congregation in the Anglican Church of North America

with about 65 active members. *Id.* ¶ 3. The IRS has recognized Holy Cross Anglican's I.R.C. § 501(c)(3) status. *Id.* ¶ 24.

### *Religious Beliefs and Teaching*

Intervenors come from different faith backgrounds and hold different beliefs. But all of the Intervenors believe—based upon their varying religious traditions—that they have a duty to instruct adherents to speak up for the vulnerable and to seek justice in their society and from their elected officials. Moodie Decl. ¶¶ 10, 12-13, 15; Vang Decl. ¶¶ 11, 21; Malone Decl. ¶¶ 7-11. Thus, at appropriate times, the Intervenors teach their congregations in ways that provide guidance on voting for political candidates. Moodie Decl. ¶ 17; Vang Decl. ¶ 18-19; Malone Decl. ¶ 12-13.

All three of Intervenors' religious traditions likewise agree that they must teach their congregations to protect unborn children. The Intervenors' faith groups believe that every human being is made in the image of God, and thus that it is wrong to intentionally take the life of innocent human beings, including through intentional elective abortion. Moodie Decl. ¶ 13; Vang Decl. ¶ 21; Malone Decl. ¶ 15. They firmly believe that members of their respective faith groups have a duty to protect unborn children, including by advocating for them, seeking justice from the government on their behalf, and electing officials who will do the same. Moodie Decl. ¶¶ 13-14; Vang Decl. ¶¶ 21-22; Malone Decl. ¶¶ 7-9. They believe that intentionally electing officials who support elective abortion is generally a grave sin. Moodie Decl. ¶14; Vang Decl. ¶¶ 22-24; Malone Decl. ¶¶ 15-17. And each of the religious leader Intervenors believes that if he does not preach on this issue at appropriate times, he himself is sinning. Moodie Decl. ¶¶ 14-15; Vang Decl. ¶¶ 22-25; Malone Decl. ¶¶ 10-12, 16, 20.

Thus, Intervenors believe that they must preach on the sanctity of human life to their congregations during religious services. Intervenors have in the past, and will in the future, teach their congregations that they should select political candidates based on whether the candidates align with their individual church's religious beliefs on this issue. Moodie Decl. ¶ 17; Vang Decl. ¶ 24; Malone Decl. ¶ 17.

Moreover, Pastor Moodie, Pastor Vang, and Father Malone preach about candidates and issues in their capacities as their churches' religious leaders during normal worship and religious gatherings. They believe that they cannot segregate that religious duty into separate times, separate roles, or different places, because that would communicate there is something different or suspect about their religious teaching on those points, and that their congregants' duty is somehow diminished concerning political matters. Moodie Decl. ¶ 20; Vang Decl. ¶ 25; Malone Decl. ¶ 21.

As a practical matter, Intervenors have no other entity or location at which to hold religious instruction on these matters, and the leaders serve no role for their churches other than being their churches' religious leader. Moodie Decl. ¶ 21; Vang Decl. ¶ 26; Malone Decl. ¶ 22.

### *The IRS Prohibitions*

Relying on its regulatory authority, the IRS "absolutely prohibit[s]" churches and the leaders of those churches, including Intervenors, from "directly or indirectly" making "public statements" that are "in favor of (or in opposition to) any candidate for public office" during "an official church service." *See* IRS Publication 1828, *Tax Guide for Churches and Religious Organizations* ("IRS Church Tax Guide") at 7-8, http://www.irs.gov/pub/irs-pdf/p1828.pdf; *accord* 26 C.F.R. § 1.501(c)(3)-1(a)(1),

(c)(3)(i) (2009). The IRS has specifically identified a minister's sermon to his church about voting for or against political candidates as "absolutely prohibited." IRS Church Tax Guide at 7-8 (Example 4); *see also* IRS Rev. Rul. 2007-41, https://www.irs.gov/irb/2007-25_IRB/ar09.html (additional instructions on IRS church speech restrictions). It has also stated that sermons on specific religious issues may likewise be absolutely prohibited based on the IRS's own determination of the "facts and circumstances" surrounding the sermons. IRS Church Tax Guide at 6-9. These "facts and circumstances" include the use of banned "code words" such as "pro-life," which Intervenors often use in their sermons on the sanctity of human life. *See* IRS 1993 EO CPE Text, *Election Year Issues*, at 411, http://www.irs.gov/pub/irs-tege/eotopicn93.pdf. If a church violates either of these prohibitions, the IRS threatens to revoke the church's tax-exempt status and the ability of members to deduct contributions from their taxes, and to impose excise taxes against both the church and its leadership. IRS Church Tax Guide at 7, 18; *see also* I.R.C. § 4955(a)-(c) (2006) (authorizing excise taxes). These punishments would deeply harm the Intervenors, especially due to their churches' small size and their members' and leaders' modest income. Moodie Decl. ¶ 27; Vang Decl. ¶ 32; Malone Decl. ¶ 29.

Though the Intervenors and other churches have been open about their religious exercise and their plans to continue it, the IRS has never enforced these prohibitions against them. Moodie Decl. ¶ 33; Vang Decl. ¶ 37; Malone Decl. ¶ 33.

### *The Previous Lawsuit*

As noted above, this is not FFRF's first attempt to mandate a change to the IRS's enforcement approach. FFRF filed a prior lawsuit on November 14, 2012, seeking an

injunction requiring the IRS "to enforce the electioneering restrictions of § 501(c)(3) of the Tax Code against churches," and to order the IRS to have an official "initiate enforcement of the restrictions of § 501(c)(3) against churches[.]" Complaint ¶¶ 1-2, *Koskinen I*, 298 F.R.D. 385 (No. 3:12-cv-0818), Dkt. 1. In that lawsuit, Father Malone and Holy Cross Anglican intervened in order to protect their rights under the First Amendment and the Religious Freedom Restoration Act. *Koskinen I*, 298 F.R.D. at 387-388. This Court granted intervention as of right because (1) it was timely sought; (2) Father Malone and Holy Cross Anglican had a protectable "interest in having Father Malone preach to the church about whom to vote [against] without jeopardizing the church's tax exempt status"; (3) denying intervention would impair their interests because they would not be able to argue in the first instance that federal law "prevents the IRS from enforcing the electioneering restrictions against churches"; and (4) the IRS "d[id] not fully represent the movants' interests" because it did "not intend to argue" that a policy of non-enforcement against churches was "compelled by the Establishment Clause and other laws." *Id.* at 386-87.

Shortly after the intervention, FFRF settled *Koskinen I* with the IRS and dismissed its lawsuit without prejudice so that it could later re-file to seek enforcement of the IRS's speech restrictions against houses of worship. Joint Motion for Dismissal, *Koskinen I*, 298 F.R.D. 385 (No. 3:12-cv-0818), Dkt. 38. FFRF repeatedly emphasized that it was willing to re-file to seek the same relief "against rogue political churches."[1]

---

[1] *See* News Release, FFRF, IRS settle suit over church politicking (July 17, 2014), https://ffrf.org/news/news-releases/item/20968-ffrf-irs-settle-suit-over-church-politicking; *accord* News Release, FFRF anti-church electioneering victory is final (Aug.

It also stated that it believed that these speech restrictions should be enforced specifically against Father Malone and Holy Cross Anglican.[2]

### The Present Lawsuit

FFRF filed this lawsuit on May 4, 2017. Just as in its last lawsuit, FFRF's complaint asks this Court to "order the Defendants to neutrally enforce the restrictions in Internal Revenue Code § 501(c)(3) against churches and religious organizations." Dkt. 1 ¶ 14. And just as before, FFRF does not ask that it be treated like churches (*i.e.*, without the application of IRS-enforced speech restrictions), but rather that churches be treated like it.

The only notable difference this time is that FFRF filed its lawsuit the same day that the President issued an Executive Order concerning, among other things, the IRS's enforcement of the Johnson Amendment. The Executive Order states that "[a]ll executive departments and agencies . . . shall . . . respect and protect the freedom of persons and organizations to engage in religious and political speech." Exec. Order No. 13,798, 82 Fed. Reg. 21,675 (May 4, 2017). The Executive Order directs that the Department of Treasury "not take any adverse action against any individual, house

---

1, 2014), https://ffrf.org/news/news-releases/item/21076-ffrf-anti-church-electioneering-victory-is-final; *see also* FFRF, *Why did FFRF sue Trump, when others did not?*, Patheos (May 8, 2017), http://www.patheos.com/blogs/freethoughtnow/why-did-ffrf-sue-trump/ ("We warned the IRS that we would refile our lawsuit if there was evidence of future lack of enforcement").

[2] *See* News Release, FFRF, IRS settle suit over church politicking (July 17, 2014), https://ffrf.org/news/news-releases/item/20968-ffrf-irs-settle-suit-over-church-politicking; *see also* News Release, FFRF opposes anti-abortion church's intervention (Dec. 17, 2013), https://ffrf.org/news/news-releases/item/19778-ffrf-opposes-anti-abortion-church%E2%80%99s-intervention.

of worship, or other religious organization on the basis that such individual or organization speaks or has spoken about moral or political issues from a religious perspective, where speech of similar character has, consistent with law, not ordinarily been treated as participation or intervention in a political campaign on behalf of (or in opposition to) a candidate for public office." *Id.* FFRF's lawsuit seeks an order both enjoining enforcement of the Executive Order and mandating enforcement of the IRS's long-stated position against religious speech of religious ministers to their houses of worship during religious services. *See, e.g.*, Dkt. 1 ¶ 14.

Since FFRF filed its lawsuit, there has been almost no action in the case. Defendants have not answered the complaint, and no dispositive motions have been filed.

## STANDARD OF REVIEW

In evaluating a motion to intervene, courts "must accept as true the non-conclusory allegations" made by the proposed intervenor, *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995), and "should avoid rigid construction of Rule 24." *Jessup v. Luther*, 227 F.3d 993, 998 (7th Cir. 2000).

## ARGUMENT

### I.  Intervenors should be granted intervention as of right.

Fed. R. Civ. P. 24(a)(2) permits intervention as of right if: "(1) the application is timely; (2) the applicant has an 'interest' in the property or transaction which is the subject of the action; (3) disposition of the action as a practical matter may impede or impair the applicant's ability to protect that interest; and (4) no existing party adequately represents the applicant's interest." *U.S. v. Thorson*, 219 F.R.D. 623, 626 (W.D. Wis. 2003) (quoting *Security Ins. Co. of Hartford v. Schipporeit*, 69 F.3d 1377,

1380 (7th Cir. 1995)). "A motion to intervene as a matter of right . . . should not be dismissed unless it appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint." *Reich*, 64 F.3d at 321, (quoting *Lake Inv'rs Dev. Group v. Egidi Dev. Group*, 715 F.2d 1256, 1258 (7th Cir. 1983)). Intervenors meet all four criteria and should therefore be allowed to intervene as a matter of right.

## A. The Intervenors' motion to intervene is timely.

Timeliness is determined "from the time the potential intervenors learn that their interest might be impaired." *Reich*, 64 F.3d at 321; *accord Thiel v. Wride*, No. 12-C-530, 2013 WL 3224427, at *2 (E.D. Wis. June 25, 2013). The "test for timeliness is one of reasonableness": courts look to see if the intervenor has been "reasonably diligent in learning of a suit that might affect their rights," and have acted "reasonably promptly" to intervene "upon so learning." *Thorson*, 219 F.R.D. at 627 (quoting *Reich*, 64 F.3d at 321). Courts then consider "the prejudice to the original parties if intervention is permitted and the prejudice to the intervenor if his motion is denied." *Reich*, 64 F.3d at 321 (citing *Shea v. Angulo*, 19 F.3d 343, 349 (7th Cir. 1994)).

The present motion presents no timeliness problems. It is being filed less than sixty days after the Intervenors first learned of FFRF's lawsuit. Moodie Decl. ¶ 37; Vang Decl. ¶ 44; Malone Decl. ¶ 39. Thus, measuring "from the time the . . . Intervenors learn[ed] that their interests might be impaired," *Reich*, 64 F.3d at 321, the timeliness standard is met.

Nor would intervention work any prejudice to the parties. No dispositive motions have been filed, and no discovery has begun. In FFRF's last lawsuit, this Court found

intervention timely over a year after the complaint was filed because intervention came "well in advance of the summary-judgment deadline" and FFRF could not show "any prejudice." *Koskinen I*, 298 F.R.D. at 388. So too here.

## B. The Intervenors have a protectable interest in the subject of the action.

The Intervenors have a protectable interest in the subject matter of the action because FFRF seeks to require Defendants to enforce an "absolute prohibition" on the Intervenors' exercise of fundamental constitutional and civil rights, which will necessarily put substantial pressure on the Intervenors to abandon those rights.

To determine whether a protectable interest is at stake, courts "focus on the issues to be resolved by the litigation and whether the potential intervenor has an interest in those issues." *Reich*, 64 F.3d at 322. Courts have "embraced a broad definition of the requisite interest" sufficient to justify intervention, *Lake Investors*, 715 F.2d at 1259, requiring only that it be a "direct and substantial" interest, *id.*, in a "legally protected right that is in jeopardy and can be secured" by intervention. *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1022 (noting that meeting this standard meets Article III standing requirements); *accord Town of Chester v. Laroe Estates Inc.*, --- S.Ct. ---, 2017 WL 2407473 (June 5, 2017) (requiring standing for intervenors in some cases). But Rule 24 requires "only that, as a practical . . . matter, [the intervenor's] interest *could be* impaired." *Habitat Educ. Ctr., Inc. v. Bosworth*, 221 F.R.D. 488, 492-93 (E.D. Wis. 2004) (emphasis added). Thus, in *Koskinen I*, it was sufficient that Father Malone and Holy Cross Anglican showed that they had an interest "in

12

having Father Malone preach to the church about whom to vote for without jeopard-izing the church's tax-exempt status" and in making unique legal arguments that "if successful, would confer a tangible benefit on the movants." 298 F.R.D. at 386-87.

Here, as in *Koskinen I*, the Intervenors have legal protectable interests in this lawsuit that will be impaired if FFRF succeeds. The sole purpose of FFRF's lawsuit is to force the IRS to begin enforcing regulations that "absolutely prohibit" the Inter-venors' religious activities. This would necessarily harm and chill the Intervenors' legally protected interests in:

1. The rights secured by the Religion Clauses of the First Amendment to the United States Constitution, including their right to be free from government interference with internal church decisions that affect the faith and mission of a church itself, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012); their right to engage in religious exercise free from interference from laws that are not neutral and generally applicable, *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); and their right to be free from discriminatory laws that favor other re-ligious groups, *see Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982).

2. The rights secured by the Free Speech Clause of the First Amendment to the United States Constitution, including their right to be free from content-based restrictions on religious and political speech, *see Capitol Square Review & Ad-visory Bd. v. Pinette*, 515 U.S. 753, 760 (1995); their right to be free from vague, prolix laws that can only be applied on a case-by-case basis and thus broadly restrict and chill their religious and political speech, *see Citizens United v.*

13

*FEC*, 558 U.S. 310, 363-64 (2010); their right to be free from laws that discriminate against religious and political speech based upon the identity of the speaker, *id.*; their right to expressive association, *see Boy Scouts of Am. v. Dale*, 530 U.S. 640, 661 (2000); and their right to speak to and hear one another*, see ACLU of Ill. v. Alvarez*, 679 F.3d 583, 592 (7th Cir. 2012) ("[W]hen one person has a right to speak, others hold a reciprocal right to receive the speech" (internal quotation marks and citations omitted)).

3. The rights secured by the Assembly Clause of the First Amendment to the United States Constitution, including the Intervenors' and their churches' right to engage in otherwise lawful worship and speech activities with persons of their choosing. *See Thomas v. Collins*, 323 U.S. 516, 532-40 (1945).

4. The right to be free from substantial government-imposed burdens on religious exercise secured by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq. See, e.g.*, *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013).

Given that these laws protect the Intervenors' right to freely express their religious beliefs in the context of religious services, intervention is appropriate to protect their interest in doing so. *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 572 (7th Cir. 2009) ("[T]he 'interest' required for intervention" requires that the intervenor "be someone whom the law on which his claim is founded was intended to protect.").

This is more than sufficient to establish a cognizable interest under Rule 24. By contrast, courts have permitted far less concrete interests, such as that of "timber companies" who intervened "in an action to bar logging in a national forest even though they had no logging contracts and merely wanted an opportunity to bid for

such contracts in the future." *City of Chicago v. Fed. Emergency Mgmt. Agency*, 660 F.3d 980, 986 (7th Cir. 2011).

## C. The Intervenors' ability to protect their interests may be impaired by the disposition of this action.

"[D]emonstrat[ing] the direct and significant nature of [the Intervenors'] interest" often alone "meets the impairment prong of Rule 24(a)(2)." *Reich*, 64 F.3d at 323. As the advisory committee explained, "[i]f an [intervenor] would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." Fed. R. Civ. P. 24, advisory committee's note to 1966 amendment.

The Intervenors would suffer significant practical harm to their interests if FFRF obtains its desired relief. Indeed, the entire point of FFRF's lawsuit is to force the IRS to stop Intervenors from engaging in their religious speech. If the IRS is enjoined to begin enforcing its "absolute prohibition" on the Intervenors' religious activities, that will place significant pressure on the churches "to modify [their] behavior to avoid future adverse consequences." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998). The Intervenors have a strong interest in continuing their religious speech, and avoiding the dilemma of either abandoning their religious exercise or risking the revocation of their tax exempt status, which would subject the Intervenors' internal church records to detailed examination, their church income to taxation by the federal government, and would prevent the Intervenors' church members from obtaining a charitable tax deduction for their tithes and offerings to their churches. IRS Church Tax Guide at 15; 26 C.F.R. § 1.501(c)(3)-1(a)(1), (c)(3)(i) (2009); *see also*

*Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967) (parties have a legal interest in avoiding the "dilemma" of "risk[ing] prosecution" if they do not comply with regulations). It could also expose Intervenors to excise taxes against both the churches and church leaders. IRS Church Tax Guide at 18; I.R.C. § 4955(a)—(c) (2006). The threat of these penalties would chill the Intervenors' religious exercise because they would severely harm the Intervenors' churches due to their small size and the modest income of their members and leadership. Moodie Decl. ¶ 27; Vang Decl. ¶ 32; Malone Decl. ¶ 29; *see also Alvarez*, 679 F.3d at 592-93 (finding that there was a "credible threat of prosecution" sufficient to chill First Amendment rights when a law "plainly prohibits" the exercise of the rights, the law "has not fallen into disuse," and the government "has not foresworn the possibility of prosecut[ion]" under the statute).

As this Court found in *Koskinen I*, it is no answer to say that the Intervenors could defend their interests in a separate action against the IRS. 298 F.R.D. at 387. The availability of a separate action is not a "bar to intervention." *City of Chicago v. Fed. Emergency Mgmt. Agency*, 660 F.3d 980, 985-86 (7th Cir. 2011). Rather, the intervention analysis focuses on "the practical effect of denying intervention." *Id.* at 987. There are three practical harms to denying intervention here.

First, a separate action would come with its "own costs and burdens," if it were available at all. Non-profits seeking to challenge tax-based restrictions are generally required by the Tax Anti-Injunction Act to first lose their tax-exempt status, "pay the tax," and "sue for a refund." *Gaylor v. Lew*, No. 16-cv-215-bbc, 2017 WL 222550, at *2 (W.D. Wis. Jan. 19, 2017) (citing *Flying J*, 578 F.3d at 573 (impairment shown if alternative means of enforcement "would impose substantial inconvenience on the

[intervenor] with no offsetting gain"); *see also* 26 U.S.C. § 7421(a). Thus the Intervenors would face not only direct financial harm, but also an indeterminately long wait before they could even begin to relieve the burden on their internal religious speech with their coreligionists.

Second, it's not clear that a separate action *would* be cleanly available. A federal agency cannot "simply disregard an adverse decision in this case," and the injunction FFRF seeks is directly adverse to the relief Intervenors would seek. *Gaylor*, 2017 WL 222550, at *2; *United States v. City of Chicago*, 870 F.2d 1256, 1262 (7th Cir. 1989) (recognizing that the potential for inconsistent judgments could subject government defendant to contempt and thus created practical obstacles to proposed intervenors' protecting their rights in a separate action). And the adverse precedent would "at the very least be persuasive authority that [the Intervenors] would have to convince the IRS not to follow." *Gaylor*, 2017 WL 222550, at *2; *accord Flying J*, 578 F.3d at 573 ("concern with the stare decisis effect of a decision can be ground for intervention"). Thus, forcing the Intervenors to wait until later to raise their claims denies them the "tangible benefit" of being able to raise them now, *Koskinen I*, 298 F.R.D. at 387, before the field has been tilted against them.

Finally, the long, disadvantaged, and potentially fruitless wait would subject the Intervenors to harms that a separate action could not repair: the loss of sensitive First Amendment rights. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *accord Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (finding that the same rule applies to RFRA). The Intervenors' religious speech would be

substantially burdened by the dilemma of choosing between exercising their First Amendment rights and violating a now-enforced "absolute prohibition" on such speech, with all its crippling tax penalties and intrusive investigations.

Viewed in the practical light required here, the Intervenors' interests would be harmed by the relief sought by FFRF, and in a way that a separate action could not relieve. Accordingly, this factor also weighs in favor of granting intervention.

### D. The Intervenors' interests are not adequately represented by the existing parties to the action.

Finally, the Court should allow the Intervenors to intervene because the Defendants cannot adequately represent their interests in this case. This factor presents a low hurdle. The Intervenors need not show that their interests are clearly not being adequately represented, only that "the representation of [their] interest 'may' be inadequate[.]" *Thorson*, 219 F.R.D. at 627 (quoting *Lake Investors*, 715 F.2d at 1261). And courts must treat "the burden of making that showing . . . as minimal." *Thorson*, 219 F.R.D. at 627. If an existing party's interests "are related, but not identical" to an intervenor's, the Court cannot simply presume that the intervenor is adequately represented. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538-39 & n.10 (1972) (articulating the "may be inadequate" standard and applying it with no presumption of adequacy).

Here, Defendants cannot adequately represent the Intervenors' interests for three reasons: because their interests and goals are very different than the Intervenors', because they will not make the same legal and factual arguments as the Intervenors, and because Defendants' interests directly conflict with those of the Intervenors.

18

First, the Defendants have nothing like the Intervenors' direct, personal interest in the outcome of this case. After all, if Defendants lose, Defendants will actually make money in increased tax receipts. It is the Intervenors, then, who are the real parties in interest here: "no group of people face more to lose if plaintiffs succeed than ministers such as the proposed intervenors." *Gaylor*, 2017 WL 222550, at *1. It is the Intervenors whose RFRA, Free Speech, Free Exercise, Expressive Association, Free Assembly, and Establishment Clause rights are directly implicated. The Intervenors can best defend those rights for themselves. *Id.* (allowing pastors to intervene in a challenge to the IRS parsonage allowance in order to present arguments regarding their Constitutional rights "from their own perspective"). Indeed, government representation is "'frequently' not adequate 'when one group of citizens sues the government, challenging the validity of laws or regulations, and the citizens who benefit from those laws or regulations wish to intervene and assert their own, particular interests rather than the general, public good.'" *Id.* at *2 (quoting 6 James Wm. Moore et al., *Moore's Federal Practice* § 24.03(4)(a) (3d ed. 2016).[3]

Second, the Intervenors plan to make factual and legal arguments that there is no reason to think that the Government would or perhaps even could make, in large part because Intervenors and the Defendants have different goals for the outcome of this

---

[3] *See also Cal. Dump Truck Owners Ass'n* v. *Nichols*, 275 F.R.D. 303, 308 (E.D. Cal. 2011) (private applicant not adequately represented by government agency because applicant's interests were more "narrow and parochial" and agency was required to consider "impact its rules will have on the state as a whole"); *Delano Farms Co. v. Cal. Table Grape Comm'n*, 1:07-CV-1610, 2010 WL 2942754, at *2 (E.D. Cal. 2010) (no adequacy of representation because "USDA, as an agency of the Executive Branch must balance a number of policy considerations").

litigation. While the IRS may follow the Executive Order in a manner that causes it to argue that it *can* treat houses of worship respectfully, there is no indication that it will argue that it *must* do so under the First Amendment or RFRA. Indeed, given that the IRS has not made any move to revise or rescind its "absolute prohibit[ion]" regulations, it is entirely possible that the government simply seeks maximal freedom to operate—leaving burdensome regulations on the books, but avoiding any requirement to enforce. Intervenors obviously have a stronger and more personal interest in arguing that enforcement is affirmatively barred by the First Amendment and RFRA.

Similarly, many of the Intervenors' interests derive from a sphere of church autonomy guaranteed by the Religion Clauses. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 189. This "constitutional protection is . . . a personal" right for religious groups, meaning that religious groups are best able to assert it. *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015). It is also a "structural limitation imposed on the government by the Religion Clauses," *id.*, meaning that the government's interest is generally not in expanding or strengthening it. Indeed, churches are often required to vigorously assert this against governmental entities. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 189 (both chronicling the long history of government encroachment and rejecting the EEOC's "remarkable view that the Religion Clauses have nothing to say about a religious organization's freedom to select its own ministers"); *accord id.* at 199 (Alito, J., joined by Kagan, J., concurring) ("the autonomy of religious groups . . . has often served as a shield against oppressive civil laws"). Thus, the Intervenors have different goals and interests in asserting a church-protecting limitation on State power than does the State itself.

The Defendants' response to FFRF's last lawsuit bears this point out. As here, FFRF claimed that the IRS was illegally failing to enforce its speech restrictions against internal church speech. The IRS could have asserted in a dispositive motion on the pleadings—as Intervenors will do here if intervention is granted—that those restrictions *cannot* be so enforced because of the First Amendment rights noted above. But it did not. Instead, the IRS's motion to dismiss claimed that it had a policy for enforcing the restrictions on "***all*** tax-exempt entities, religious and non-religious alike" and that this Court lacked jurisdiction to hear FFRF's complaint to the contrary. Defs.' Mem. in Supp. of Mot. to Dismiss at 1-2, *Koskinen I*, 298 F.R.D. 385 (No. 3:12-cv-0818), Dkt. 13 (emphasis in original).

Along those lines, it remains to be seen how expansively the IRS will interpret the Executive Order. It is possible to read the order as simply affirming the IRS's current interpretation of the Johnson Amendment, particularly given the Executive Order's qualification that it only applies "to the extent permitted by law" and only protects speaking about "moral or political issues" where the speech has "not ordinarily been treated as" forbidden. *See* 82 Fed. Reg. at 21,675; *see also id.* at 21,676 (stating that the order does not "impair or otherwise affect the authority granted by law to an executive department or agency" and that it "shall be implemented consistent with applicable law"). If so, the IRS's position would not be just different and less robust than the Intervenors', but—as further noted below—directly at odds to theirs.

The Intervenors are also able to inform the record before this court with factual context on how religious leaders actually provide issue- and election-related religious guidance to their congregations during worship services, how religious leaders and

congregations evaluate the risks created by the IRS's guidance and FFRF's enforce-ment actions, and the harmful effect of enforcing or threatening to enforce the IRS's speech restrictions on small churches. *See Gaylor*, 2017 WL 222550, at *1 (granting intervention in part because "the proposed intervenors want to provide facts to the court related to how the tax exemption they receive works in practice"). Moreover, should FFRF's claims survive Intervenors' dispositive motion on the pleadings, Inter-venors plan to seek discovery from FFRF and the IRS demonstrating that the speech restrictions have historically been used in a discriminatory manner against disfa-vored religious speakers.

Finally, Defendants' "substantive interests" remain in conflict with the Interve-nors'. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 508 (7th Cir. 1996) (citing *Trbovich*, 404 U.S. at 538-39; *see also Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 594 (7th Cir. 1993) ("[a]dequate representation of the same legal interests necessarily entails the absence of conflicts of interest"). This conflict comes up in two ways: first, via the basic incentive structures involved, and second, the IRS's longstanding and as-yet un-disavowed rules that specifically and "absolutely" prohibit the Intervenors' religious speech.

As to the first: the Intervenors face serious, and even ruinous, financial harm if they lose their 501(c)(3) status. Defendants, by contrast, will *benefit* financially if they were to revoke the tax-exempt status of the Intervenors and other houses of worship. Indeed, Plaintiffs allege that the Defendants could collect up to $100 billion more per year. Dkt. 1 ¶ 88. The IRS would collect the very taxes that could seriously curtail

the vital community ministries run by the Intervenors. Indeed, the IRS actively solicits complaints against nonprofits and offers a financial reward for turning in churches who violate the IRS's speech restrictions. *See* IRS Form 13909, Tax-Exempt Organization Complaint (Referral) (Dec. 2016), https://www.irs.gov/pub/irs-pdf/f13909.pdf; *see also* IRS Form 211, Application for Award for Original Information (Mar. 2014), https://www.irs.gov/pub/irs-pdf/f211.pdf. It is difficult for the IRS to represent the Intervenors' rights against FFRF when the IRS is actively soliciting and rewarding entities like FFRF to turn in the Intervenors for exercising those rights.

As to the second: Defendants' long-standing, oft-repeated, and un-disavowed guidance is that the Intervenors' religious speech is "absolutely prohibited." IRS Church Tax Guide at 7. For example, in its current guidance, the IRS has specifically identified the precise religious exercise that the Intervenors seek to protect via intervention—sermons that provide religious instruction on voting for specific candidates—as banned. *Id.* at 7-8, Example 4. Similarly, it has created a broad "facts and circumstances" test that chills and effectively proscribes most issue-related sermons. *Id.* at 7-8; *Election Year Issues* at 411. Indeed, the longest part of the IRS's instructional tax guide for churches—four times longer than the next longest section—concerns only the restrictions that the IRS places on the Intervenors' sermons. IRS Church Tax Guide at 7-15. FFRF itself cites the IRS's agreement to "enforce" the Johnson Amendment in a settlement. Complaint ¶26. Indeed, at the end of FFRF's last lawsuit, Defendant Koskinen informed Congress that the IRS had formed a "Political Activities Referral Committee" to investigate "99 churches" that it had "identified . . . as having potential impermissible political campaign intervention activities." *See* Letter from

23

John Koskinen, IRS Commissioner, to Congressman Scott Garrett (Sept. 5, 2014), http://s3.amazonaws.com/becketpdf/IRS-response-to-Garrett.pdf. Given the IRS's longstanding and still extant policy and practice, "the government ha[s] substantive interests at variance with that of the [intervenor]" and cannot adequately represent the Intervenors' interests. *Solid Waste Agency*, 101 F.3d at 508.

In sum, there is more than enough reason to conclude that the Intervenors' surmount the "minimal" burden of simply showing that that the IRS's representation "may" be inadequate. *Thorson*, 219 F.R.D. at 627.[4]

## II. Alternatively, the Intervenors should be permitted to intervene under Rule 24(b).

Even if this Court were to find that the Intervenors cannot intervene as of right, permissive intervention is appropriate. Rule 24(b) authorizes this Court to permit intervention when "an applicant's claim or defense and the main action have a question of law or fact in common." The determination of whether a party will be able to intervene is within the discretion of the court, which will consider whether it will unduly delay the main action or unfairly prejudice the existing parties.

The Intervenors easily qualify for permission to intervene in this case. The Intervenors' interest in protecting their religious exercise presents common questions of law and fact with those of the existing parties. Indeed, the legal questions are inescapably wrapped up in FFRF's claims. FFRF asserts that the Establishment Clause

---

[4] Should this Court be inclined to find that Defendants currently adequately represent the Intervenors' interests, the Intervenors request that the Court defer consideration of that question until later in the case, when the Intervenors can further evaluate the adequacy of Defendants' representation. *See Solid Waste Agency*, 101 F.3d at 508-09; *accord Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 776 (7th Cir. 2007).

*requires* enforcement against houses of worship; Intervenors assert that the Establishment Clause forbids it. FFRF alleges that failure to enforce violates the Take Care Clause; Intervenors argue that nonenforcement effectively obeys it.

Moreover, as noted above, this motion is timely and intervention will neither require any change to existing deadlines nor prejudice the current parties. The significance of the Intervenors' interests in the subject matter of this litigation outweighs any marginal additional burden that would be caused by intervention. *See City of Chicago*, 660 F.3d at 986 (reversing denial of permissive intervention, noting that a concern about "unwieldy" litigation was insufficient to justify denying intervention, especially where the intervenor promised to streamline its participation). Even if the Court concluded that the Intervenors cannot intervene as of right, it should nonetheless permit intervention under Fed. R. Civ. P. 24(b).

## CONCLUSION

The Intervenors' motion to intervene should be granted. Intervenors will file a dispositive motion on the pleadings if they are allowed to intervene.

Dated: June 29, 2017                     Respectfully submitted,

                                        /s/ Diana Verm
                                        Eric C. Rassbach
                                        Diana M. Verm
                                        Daniel H. Blomberg
                                        The Becket Fund for Religious Liberty
                                        1200 New Hampshire Ave. NW, Suite 700
                                        Washington, DC 20036
                                        Telephone: (202) 955-0095
                                        Facsimile: (202) 955-0090

                                        *Counsel for Proposed Intervenors*