## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

FREEDOM FROM RELIGION
FOUNDATION, INC., DAN BARKER,
and ANNIE LAURIE GAYLOR, Co-
Presidents of FFRF,

    *Plaintiffs*,

    v.

DONALD TRUMP, President of the
United States; and JOHN KOSKINEN,
Commissioner of the Internal Revenue
Service,

    *Defendants*.

Case No. 3:17-CV-00330

## DECLARATION OF E. CHARLES MOODIE

1.    My name is Pastor Charles Moodie. I am over the age of 21 and am capable of making this unsworn declaration pursuant to 28 U.S.C. § 1746. I have not been convicted of a felony or crime involving dishonesty, and the facts contained herein are either within my personal knowledge or are based upon teachings of my church with which I am familiar and which I believe to be true and correct.

2.    I am a head pastor at Chicago City Life Center ("Life Center"), and my wife, Kehinde Moodie, is my co-pastor. In that role, I am responsible for the preaching and teaching delivered at the Church. I have served at Life Center for nearly five years.

3.    I became a Christian while working as a security guard at a bank in New York City. I was trained in the faith by my pastor at Yonkers Christian Assembly, an Assemblies of God church. I became principal of the church's private school, Yonkers

Christian Academy and became the youth pastor at the church. I served the Assemblies of God New York Ministry Network as a representative for the Bronx, Manhattan, and Westchester.

4.      Life Center is a small church in the Englewood neighborhood of Chicago. My wife and I were drawn to this church because of the neighborhood's problems with violence, drugs, alcohol abuse, gangs, prostitution, and poverty, and because of God's calling on our lives to address those realities with the love of Christ. The primary focus of Life Center is reaching the people of the inner city with the healing truth of Jesus Christ. We believe that if those who are truly lost are able to discover their identity in Jesus Christ, lives and entire communities can be changed. To carry out that belief, we support a thriving ministry of volunteers to the people of Englewood.

5.      My wife and I live near Life Center so that we can more effectively minister to our community. Because the neighborhood is dangerous, we do not let our children play outdoors at night.

6.      Life Center's Sunday worship services typically have about 80 attendees, most of whom live in Section 8—that is, publicly subsidized—housing. We also hold Tuesday night outreach services, which often draw about 120 people seeking food and clothing. And we hold events around the holidays to give away Thanksgiving meals and Christmas presents to our community. Life Center volunteers serve about 9 times a year in public schools.

7.      Life Center is a Fellowship of the Assemblies of God.

8.      Life Center is an Illinois not-for-profit corporation and has been incorporated since December 7, 1990.

9.      Life Center obtains its 501(c)(3) status as a church subordinate unit covered by the group exemption of the Assemblies of God, which is recognized by the IRS as a tax exempt nonprofit corporation. Life Center was officially listed as a part of the General Council of the Assemblies of God on August 31, 1992.

10.     As the lead pastor at Life Center, the Bible's teaching requires me to preach to the congregation about what it means to be a follower of Jesus Christ and to prayerfully respond to His call in all aspects of their lives.

11.     This requires me to "provide biblical moral instruction" on societal problems faced by my congregation in order to encourage "the church, rooted in the eternal truths of God's Word" to "seek to lift the standards of society by overcoming evil with good." Assemblies of God Position Statement, *Sanctity of Human Life*, https://ag.org/Beliefs/Topics-Index/Abortion-Sanctity-of-Human-Life. This includes teaching the congregation of their responsibility to "be a people who demonstrate God's love and compassion for all the world" and to "meet[] human need with ministries of love and compassion." Assemblies of God Statement of Fundamental Truths, https://ag.org/Beliefs/Statement-of-Fundamental-Truths.

12.     I must accordingly speak to the specific societal injustices that my congregants face. "While evangelism and discipleship must always be the foremost task of the Church, the people of God cannot stand aside from the social evils and injustices of our time, about which the Bible speaks so powerfully." Assemblies of God

3

Position Statement, *Church Mission and Peacemaking*, https://ag.org/Beliefs/Topics-Index/Church-Mission-and-Peacemaking. At times, these injustices have political implications. I consider it my duty as a pastor to address these issues at times of local and national elections so that my church is informed about what the Bible teaches and what that means for their choices.

13.     One such issue is the sanctity of human life. The Assemblies of God believes that every human being is made in the image of God, and thus that it is wrong to intentionally take the life of innocent human beings. We believe that "[e]very human life, from conception through death, therefore to be valued, respected, nurtured, and protected." *See* https://ag.org/Beliefs/Topics-Index/Abortion-Sanctity-of-Human-Life. Accordingly, we believe that God wants unborn children to receive the same respect enjoyed by every other member of the human community.

14.     The Assemblies of God's theological position statement on the sanctity of human life encourages Christians to "actively support candidates who embrace the sanctity of life" and to broadly seek justice for the unborn both "in their homes and all possible public forums." *See* https://ag.org/Beliefs/Topics-Index/Abortion-Sanctity-of-Human-Life. I believe it is my pastoral duty to engage in this advocacy and to instruct my congregation to do the same.

15.     Another issue on which I preach to my congregation is speaking out against racial discrimination and injustice. An important part of the Assemblies of God's belief that every human being is made in God's image is the belief that God hates unjust racial or ethnic discrimination. That's why, for instance, Matthew 25:31-46

instructs Christians to welcome strangers, why Acts 6:1-7 described Christians serving across ethnic boundaries, and why Exodus 22:21 solemnly orders God's people that they must "not mistreat or oppress a foreigner." The Assemblies of God believes that the Church should reflect God's love for *all* people, not just those who look or act like us. All members of the church are equal in dignity and worth because we "are all one in Christ Jesus." *Galatians* 3:28. We have a duty to speak up and defend those who are oppressed or needy. *Psalm* 82:3-4. In cases where the denomination has failed to live up to this belief in the past, its leadership has publicly confessed and repented of its sin.

16.     The Assemblies of God increasingly reflects this belief in godly diversity. The Assemblies of God traces its roots to the ministry of William J. Seymour, an African-American minister who was one of the founders of the Pentecostal movement. Our denomination has about 68 million adherents in 255 countries, territories, and provinces. Much of our growth in the United States has been driven by young people and immigrants, with over half of our U.S. adherents now under age 35 and almost half of them nonwhite ethnic minorities. Most of our international growth has been in the Global South.

17.     I have in the past, and will in the future, declare to my congregation that, as Christians, they should select political candidates based on whether the candidates align with our beliefs on issues like the sanctity of human life and racial justice.

18.     There is a long history of trying to prevent black pastors and congregations from addressing injustice. To take just one example: Martin Luther King, Jr., was not

only targeted by the FBI and the IRS for discriminatory, abusive investigations in retaliation for his religious speech, but many private citizens—including, shamefully, religious leaders—urged him to remain silent.

19.     As a black pastor serving a majority-black congregation, I will not be silent. Rather, I will preach the Word "in season and out of season," as commanded by II Timothy 4:2 and as directed by my conscience.

20.     I preach about candidates and issues in my capacity as a pastor during our normal worship services and religious gatherings. I cannot segregate that Christian duty into separate times, separate roles, or different places because that would falsely communicate that there is something different or suspect about Christian teaching on these points. It would also inappropriately suggest that our duties as a Church are diminished as it concerns political matters.

21.     Further, as a practical matter, Life Center has no other entity or location at which to hold religious instruction on these matters, and I serve no function other than head pastor.

22.     Thus, providing such religious guidance in a separate time, location, entity, or role would interrupt and interfere with the Church's internal mission and structure.

23.     It is my understanding that the IRS absolutely prohibits me from directly or indirectly making statements to my congregation about whether to vote for or against candidates for public office.

24.     It is also my understanding that the IRS absolutely prohibits me from preaching on issues in a way that does not mention candidates but, in the IRS's view, has the indirect effect of supporting or opposing candidates for public office.

25.     It is further my understanding that the IRS threatens to punish violations of these absolute prohibitions with revocation of the Assemblies of God's tax exempt status, which would both subject Life Center's income to detailed examination and taxation by the federal government and would prevent its members from obtaining a tax deduction for their tithes and offerings to the Life Center.

26.     Further, it is my understanding that the IRS may also elect to punish Life Center by imposition of excise taxes against both the church and against church leaders such as myself.

27.     These sanctions would severely harm Life Center, both because of its small size and the modest income of its members, and its leadership.

28.     Further, as I understand it, the revocation of Life Center's tax-exempt status could harm the entire denomination of the Assemblies of God, since Life Center's tax-exemption is a part of the denomination's. This places significant pressure on me to censor my speech to my congregation during our worship services.

29.     The IRS's sanctions would substantially burden my and Life Center's religious exercise of providing certain religious teaching during worship services.

30.     The IRS's sanctions are disproportionate. Neither I nor Life Center spends any appreciable funds on the portion of my sermons which speak on matters penalized by the IRS. Yet simply for providing this teaching, the entirety of Life

Center's nonprofit status—and perhaps the Assemblies of God's—is jeopardized, along with the tax deductibility of tithes from the congregation to Life Center.

31.     These sanctions are also inappropriate. The IRS should not control the internal governance of either Life Center or the Assemblies of God, our internal decisions about our religious mission and instruction, or how we choose to organize our worship services. Yet the IRS uses its stated direct prohibition and the threat of sanctions to influence and coerce these internal church decisions.

32.     Thus, the threat of these sanctions has chilled and continues to chill my efforts to preach to my congregation as I believe God commands. I have not allowed the threat to entirely prevent me from following beliefs, but it has consistently created concern both for me and my congregation. This worry has interfered with the congregation's ability to receive, understand, and implement the message that I have preached to them.

33.     The IRS has not directly enforced these threats against me or Life Center, even though I do not hide that I have preached sermons that directly offered religious guidance to my congregation to allow their voting habits to be guided by religious considerations on specific moral issues in specific elections.

34.     I am aware that the IRS has targeted religious leaders and nonprofits based on whether they speak in ways that the current administration disfavors. I think that it is discriminatory for the government to punish the Life Center and me because my religious speech to Life Center touches on issues of current public importance. The IRS should not favor houses of worship which choose to remain silent.

35.     It is my understanding that the Freedom From Religion Foundation ("FFRF") filed a lawsuit against IRS Commissioner John Koskinen and President Donald J. Trump to compel the IRS to take enforcement action against churches like Life Center to prevent us from preaching on certain issues.

36.     If FFRF is successful, the IRS will be subject to a legal requirement to take enforcement action against churches like Life Center, and I will face substantial pressure to end my religious exercise of providing religious instruction on matters that relate to voting choices. That pressure injures my statutory and constitutional rights of religious freedom, freedom of speech, and freedom of association, including government interference with the Church's internal mission and structure.

37.     I first realized this threat in early May 2017, after learning of FFRF's lawsuit to enforce the IRS's speech restrictions against churches, *FFRF v. Trump*, No. 3:17-CV-00330 (W.D. Wis.).

38.     I was particularly concerned because it is my understanding that the IRS already considers my teaching to Life Center to be illegal. Thus, I cannot expect the IRS to assert my statutory and constitutional rights against FFRF's requested enforcement in the *Trump* case.

I declare under penalty of perjury that the foregoing is true and correct.

     Executed on June 24, 2017.


_E. Moodie_
_____
Pastor E. Charles Moodie